IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 10, 2017

**HENRY LEE BURRELL v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Lincoln County**
**No. 2013-CR-57     Forest A. Durard, Jr., Judge**
_____

**No. M2015-02115-CCA-R3-PC – Filed March 9, 2017**
_____

Henry Lee Burrell ("the Petitioner") pled guilty to six counts of first degree murder and was sentenced to four concurrent and two consecutive life sentences under the terms of a plea agreement. The Petitioner filed a petition for post-conviction relief, which the post-conviction court denied after a hearing. The Petitioner now appeals the denial of his petition for post-conviction relief, contending: (1) that the post-conviction court erred in denying his request for a psychological examination at the post-conviction hearing; (2) that his guilty plea was unknowing and involuntary; and (3) that trial counsel rendered ineffective assistance of counsel. After a thorough review of the record and applicable case law, we affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Melissa L. Thomas (post-conviction hearing), Fayetteville, Tennessee, and Elizabeth Russell (on appeal), Franklin, Tennessee for the appellant, Henry Lee Burrell.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Robert J. Carter, District Attorney General; Ann L. Filer, Deputy District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

*Guilty Plea Submission Hearing*

On January 22, 2014, the Petitioner entered a guilty plea to six counts of first degree premeditated murder. Under the terms of the plea agreement, the Petitioner received six life sentences; two life sentences were to be served consecutively to each other and the remaining four life sentences were to run concurrently. The State offered the following recitation of facts in support of the Petitioner's guilty plea:

> The [Petitioner] in this case[] . . . met an individual named Warren Vincent Crutcher while both of these men were incarcerated prior to 2012.
>
> In 2012, Warren Crutcher was engaged in the sale of illegal drugs, and [the Petitioner] became a member of Mr. Crutcher's crew. In the fall of 2012, another individual named [co-defendant] Zakkawanda Moss had been released on parole. And [the Petitioner] brought [co-defendant] Moss into the drug operation as well.
>
> Warren Crutcher had expressed a desire or an interest in relocating his operation to Atlanta, Georgia, or to ceasing his operation and ending his involvement in the drug business. But the move to Atlanta . . . would have left the [Petitioner] and [co-defendant] Moss without their current livelihood of selling drugs.
>
> In addition Mr. Crutcher was thought to have been using drugs himself by the [Petitioner], to the point that [the Petitioner] considered Warren Crutcher to be unreliable in the business.
>
> The [Petitioner] and [co-defendant] Moss decided that they would murder Warren Crutcher. And [they] decided that they would steal his money and his drugs, which [the Petitioner] and [co-defendant] Moss knew were customarily hidden at the Lincoln County home where Warren Crutcher resided, at the time[,] [with] two of his female[] companions and those females' children as well as his.
>
> On October the 21st, and into October 22nd, the [Petitioner] lured Warren Crutcher to meet [the Petitioner] and [co-defendant] Moss at one of those residences here in Lincoln County, Tennessee.

Unbeknownst to [the Petitioner], Warren Crutcher had a friend with him, a relatively new girlfriend named Amber McCaulley.

Ms. McCaulley was executed, and her body was dragged from the vehicle inside the garage of the Huntsville Highway house here in Lincoln County, Tennessee, and ultimately placed or thrown into a makeshift laundry room inside the garage of the Huntsville Highway house. . . .

Thereafter, the [Petitioner's] crime spree moved inside the Huntsville Highway house. This house was then occupied by a pregnant female named Chabreya Campbell as well as her two young sons; including 16-month-old [R.R.],[1] who was ultimately stomped to death by [the Petitioner] and [co-defendant] Moss. And the State's theory is that this was to coerce information from Chabreya Campbell.

Chabreya Campbell was ultimately beaten, tied up, and placed in a bathtub partially filled with water, where Chabreya Campbell was ultimately strangled by means of ligatures around her neck, where she died.

Chabreya's unborn daughter at the time was an eight-month-old fetus, [who] died along with her mother. That baby has since been named[] and buried. Her name was [N.C.].

Thereafter, the [Petitioner] and [co-defendant] Moss moved their killing spree to the home of another individual, a female named Jessica Brown. . . . Inside Ms. Brown's house, Jessica lived with her two-month-old son.

The two men entered the house and beat and subdued Ms. Brown, tying her up and putting her in the bathtub, again, partially filled with water.

There, Jessica Brown was tortured with ligatures around her throat, pulled tight, pulled repeatedly, ultimately the cords and strings cut multiple times into the flesh of Jessica Brown, and ultimately killed her.

---

[1] It is the policy of this court to refer to minor victims by their initials. We intend no disrespect.

The . . . Huntsville Highway house and . . . [Ms. Brown's house] were ransacked by the two men, including the [Petitioner], and ultimately looted by the two men.

Warren Crutcher was then executed. He was shot from behind, while he was seated in a white rental car, a Hyundai Elantra. Warren Crutcher bled copiously as his body was taken from the murder location in Tennessee, to a secluded wooded spot located just across the Alabama state line, and dumped, before being covered with branches and leaves on the dumpsite. And this was located just off of BH Reeves Road, several hundred yards south of the state line and ultimately in Madison County, Alabama.

[Co-defendant] Moss and [the Petitioner] drove . . . Warren Crutcher's vehicle to Huntsville, Alabama. The vehicle was dropped off at an apartment complex on Sparkman Drive in Huntsville, where [the Petitioner's] girlfriend was summoned to pick [the Petitioner] and [co-defendant] Moss up.

When [the Petitioner] and [co-defendant] Moss got into the girlfriend's vehicle, they had blood on them, [and] they had the odor of blood on them as well.

[The Petitioner] was wearing gloves. [Co-defendant] Moss was carrying weapons. And these weapons were taken from the deceased Warren Crutcher.

The men then tried to get more money by using the deceased Warren Crutcher's debit card at a location on Sparkman Drive, the Wal-Mart shopping center.

In addition, these individuals stopped again at a Wavaho Gas Station on Winchester Road in North Madison County, in an effort to use the deceased Warren Crutcher's debit card, to again get more profit or more gain from the murder[] [of] the deceased Warren Crutcher.

[The Petitioner] and [co-defendant] Moss'[s] bloody clothes were disposed of in a dumpster, at an apartment complex in Madison County, Alabama.

During the plea colloquy, the Petitioner agreed that he had read his plea petition and understood its contents. The Petitioner also agreed that he understood the charges against him and the potential sentences he could receive for those charges. The trial court informed the Petitioner of the elements that the State would have to prove at trial before the Petitioner could be convicted of first degree premeditated murder. The Petitioner agreed that it was his desire to enter a guilty plea despite his prior request for a speedy trial under the Interstate Compact on Detainers. The following exchange occurred between the trial court and the Petitioner:

TRIAL COURT: Okay. Have you thought about your right to a trial in this case --

THE PETITIONER: Yes, sir.

TRIAL COURT: -- and decided -- All right. And now having previously been insisting upon that right, is it your desire to withdraw your request for that speedy trial?

THE PETITIONER: No, sir.

TRIAL COURT: Do you understand my question?

THE PETITIONER: What did you say?

TRIAL COURT: All right. Are you insisting upon – I'm asking you what changed your mind.

THE PETITIONER: Eventually I just want[ed] to get it over with.

TRIAL COURT: Do you think it's – is it based upon what your attorneys have presented to you and based upon of course what happened to your co-defendant, that you decided to change your mind?

THE PETITIONER: No. I just want to get it over with myself.

TRIAL COURT: Okay. Well, in that particular situation, [the Petitioner], are you just rushing in this to get it over with and . . . why are you saying you want to get it over with? Define what you mean.

THE PETITIONER: Define what I mean?

TRIAL COURT: Yes.  Okay.  At first you were insisting upon your rights to a trial, and now you want to get it over with.  I just want to make sure that this is your free and voluntary act.

THE PETITIONER: Yeah, this is my free and voluntary act.

The Petitioner agreed that he had discussed the State's evidence against him with counsel[2] and that counsel answered any questions that he had concerning the State's evidence.  The Petitioner agreed that he understood that the plea agreement specified that he would receive two consecutive and four concurrent life sentences of sixty years with release eligibility after 100% of service with maximum credits of fifteen percent.  The Petitioner agreed that he had the right to proceed to trial, to be represented by counsel at trial, to testify or not testify at trial, to confront the State's witnesses, and to present his own proof.  The Petitioner agreed that it was his desire to plead guilty and that he was guilty of six counts of first degree premeditated murder.  The Petitioner stated that he understood that by entering a guilty plea he would waive his right to a jury trial and to appeal his convictions.  The Petitioner again affirmed that entering the guilty plea was his free and voluntary act.  The Petitioner stated that he had not been promised anything in exchange for pleading guilty and had not been threatened or forced to plead guilty.  The Petitioner again agreed that entering the guilty plea was his free and voluntary act.  The Petitioner stated that he did not have any complaints about counsel's representation.  The trial court found that the Petitioner was "competent to enter his plea of guilty[,] that he underst[ood] the direct and relevant consequences of that plea[,] that [he entered] th[e] plea knowingly, understandingly and voluntarily[,] and [that there was] a factual basis for th[e] plea."  The trial court accepted the Petitioner's guilty plea.

*Post-Conviction Proceedings*

The Petitioner filed a timely petition for post-conviction relief.  At the post-conviction hearing, the Petitioner testified that he finished the eighth grade in Alabama and started the ninth grade but did not complete that grade.  He stated that, while he was in school, he was in a special education classroom because he was a "slow learner."  He stated that he could read "all right" and that his writing skills were "decent" but "not good."  The Petitioner testified that, while he was in school, he received mental health counseling at the Mental Health Center in Huntsville, Alabama.  He also received mental health counseling while he was incarcerated in the Madison County Jail in Alabama, the

---

[2] During the course of this case, several attorneys assisted with the Petitioner's representation.  For purposes of clarity, we will refer to the attorneys collectively as "counsel" and individually as "lead trial counsel" or "co-counsel."

Alabama state prison system, and the Tennessee state prison system. The Petitioner stated that he had been treated previously for bipolar disorder, stress, and anxiety.

The Petitioner testified that he met with counsel while he was incarcerated at Riverbend Maximum Security Prison ("Riverbend") in Nashville, where he was in isolation and he had very little contact with other people. He stated that, during his first meeting with counsel, they discussed whether the Petitioner would plead guilty and accept a life sentence, but they did not discuss trial strategy or the evidence against him. Moreover, counsel did not ask him about his education, his mental health, or the possibility of having a competency evaluation. The Petitioner stated that he was later transferred from Riverbend to a county jail in Lewisburg where he was also placed in isolation. Two investigators from the Public Defender's Office met with him while he was incarcerated in this facility and showed him some "films" of the crime scene, but the investigators could not answer his questions about his case. The Petitioner stated that lead trial counsel informed him that she was not "death certified" and that she would "lose the case" if the State filed a notice seeking the death penalty, which made him feel like he could not proceed to trial because he would lose and receive the death penalty. The Petitioner also stated that he requested several times that lead trial counsel provide a copy of his discovery materials, but he never received any discovery. The Petitioner testified that he was unsure of how his cellphone records could affect his case because he spoke with Mr. Crutcher every day, and counsel did not explain the ramifications of this evidence to him.

The Petitioner testified that an employee from the Public Defender's Office observed co-defendant Moss's trial, but counsel only told him that the testimony presented at co-defendant Moss's trial was mostly about the Petitioner. The Petitioner testified that, when he observed co-defendant Moss's sentencing hearing, he had been in isolation for almost a year in different prison facilities, he was depressed, and he wanted to "have contact with people." He stated that lead trial counsel told him that he "might as well just plead guilty, because she said the people from Lewisburg[,] they [were] conservative, they [were] from her hometown." The Petitioner stated that lead trial counsel told him that, if his trial received a change of venue, the jury would not like the fact that they had to travel and that the jury would find him guilty. The Petitioner also testified that counsel showed him a death penalty notice from the State, but he stated that counsel had not discussed the possibility that he might receive the death penalty until that time.

The Petitioner testified that he felt forced to plead guilty because lead trial counsel had told him that she was not "death certified" and that the jury would find him guilty and because he had never received a copy of his discovery to help determine whether he should proceed to trial. The Petitioner stated that he was not guilty of the six charges of

first degree premeditated murder and that, during the plea colloquy, he informed the trial court that his guilty plea was not coerced because he "want[ed] to get this over with." The Petitioner stated that he was "all [shaken] up" when he pled guilty because he was defending himself against false allegations while separated from his family. He testified that he thanked lead trial counsel for representing him because he was "trying to convince her to give [him] [his] discovery." The Petitioner stated that he was receiving treatment for anger management and counseling while incarcerated.

On cross-examination, the Petitioner stated that he agreed with the State's recitation of facts and agreed with the trial court that he was guilty of six counts of first degree premeditated murder during the plea colloquy because he was not in his "right state of mind at the time." The Petitioner testified that, when the trial court asked the Petitioner at the plea colloquy if he had any health problems, the Petitioner did not tell the trial court that he was not in his "right state of mind" because "[he] wasn't in [his] right state of mind to tell [the trial court] that." The Petitioner stated that he informed the trial court that he did not have any complaints about counsel's representation because he "was ready to get this over with." The Petitioner stated that he informed several employees from the Public Defender's Office that he disliked being housed in isolation, but he denied that "[his] main concern was finding out what privileges [he was] going to get and what level [of] security [he was] going to be once [he was] sentenced[.]" The Petitioner denied that he asked co-counsel for a mental evaluation approximately one month before his scheduled trial date. The Petitioner did not remember that co-counsel informed him that requesting a mental health evaluation so close to trial might give the State more time to file a death penalty notice.

The Petitioner stated that he pled guilty to eleven different offenses between 1996 and 2008 in Alabama. The Petitioner testified that he had never been found to be incompetent to stand trial or to plead guilty in any of his prior criminal cases in Alabama. When asked if the trial court explained his rights to him during his plea colloquy in the instant case, the Petitioner responded that he "believe[d] he did, [but he was not] for sure." The Petitioner testified that he experienced "a lot more stress" when he pled guilty in the current case than he had experienced in past cases. The Petitioner agreed that he never informed the trial court that he was stressed and did not understand what was going on during the guilty plea submission hearing but stated that counsel should have informed the trial court during the plea colloquy that he was experiencing stress. He explained that he told the trial court during the plea colloquy that his guilty plea was made freely and voluntarily and that no one had made threats or promises to force him to plead guilty because counsel told him to answer "yes" to all of the trial court's questions.

The Petitioner stated that he did not remember informing counsel that a third individual was involved in the offenses. The Petitioner denied that counsel told him that

they investigated but could not find evidence of a third individual involved in the current offenses. The Petitioner also denied that, after counsel investigated the possibility of a third suspect, he admitted to them that he and co-defendant Moss were the only individuals involved in the current offenses. The Petitioner agreed that counsel discussed with him the possibility of testifying against co-defendant Moss but stated he could not testify against co-defendant Moss because he could not testify about something he knew nothing about. The Petitioner asserted that lead trial counsel never informed him that Angela Hill testified at co-defendant Moss's trial that, when she picked up the Petitioner and co-defendant Moss in Huntsville, they were covered in blood, that her testimony would be damaging to him, or that evidence that was excluded in co-defendant Moss's trial might be admitted in his trial. The Petitioner testified that he did not remember winking or smiling at the news reporter's camera as he walked out of his guilty plea submission hearing. The Petitioner agreed that he was depicted in two photographs of his guilty plea submission hearing but denied that he was winking in the photographs.

Lead trial counsel testified that she had worked as a public defender since 1992, either as an Assistant District Public Defender or as the elected District Public Defender of the 17th Judicial District. She testified that she "actually had every single person in [her] office, including [her] secretaries and every single attorney working at some point in some manner on [the Petitioner]'s case." Lead trial counsel stated that her office had previously handled three death penalty cases and a mass murder case. She explained that, "[t]o do a death penalty case in Tennessee, you have to be death penalty qualified," "have so much training every two years . . . [,]" and submit a form to the Administrative Office of the Courts with the attorney's qualifications. Lead trial counsel testified that her office was death penalty qualified, meaning that "there [were] enough attorneys in [her] office that [were] death penalty qualified that [they] could handle a death penalty case."

Lead trial counsel stated that the Petitioner's trial was set for February 2014 and that she informed the Petitioner that, if the State filed a death penalty notice in his case, her office would need to attend training in March 2014 to retain its death penalty certification. Lead trial counsel stated that her office requested discovery from the State and met with the Petitioner for several hours the day that he was indicted by the Lincoln County Grand Jury. During this meeting, she discussed the trial process and his speedy trial motion with the Petitioner, and she asked the Petitioner questions "to try and determine whether [she] had any grounds whatsoever to ask for a mental evaluation." She testified that "the very first thing [she] look[ed] for when [she had] a murder case, particularly a murder case that involve[d] a mass number of victims, [were] mental health issues." However, she could not determine any grounds under which she could request a mental evaluation for the Petitioner. She also stated that, during this meeting, the Petitioner informed her that he attended high school, that he went as far as the eleventh grade, and that he attended regular, not special education, classes. Lead trial counsel did

not inform the Petitioner that she was scared to go to trial or that she did not want to go to trial nor did she discuss the possibility of proceeding to trial or entering a plea during the first meeting. Lead trial counsel stated that, "at the very beginning, [the Petitioner] was very insistent upon going to trial."

Lead trial counsel testified that she, co-counsel, and two other assistant public defenders met with the Petitioner while he was incarcerated at Riverbend. She "wanted the other attorneys to also see if they could come up with any reason . . . to file for a mental evaluation." She recalled that the Petitioner seemed "at home with his situation" at Riverbend and noted that the Petitioner "was always smiling[,]" which was unusual for "someone who was facing such serious charges." Additionally, lead trial counsel testified that the Petitioner informed her that "he was able to communicate with other inmates" by passing notes. Lead trial counsel testified that the Petitioner "didn't show the level of stress and anxiety that [she had] seen in many of [her] clients before."

Lead trial counsel could not recall how many times counsel had visited the Petitioner, but she stated that, at a later meeting with the Petitioner, she discussed with him the possibility of testifying against co-defendant Moss. The Petitioner "was very frank immediately that no, he would not be willing to do that." Lead trial counsel noted that, up until that point, the Petitioner had denied being involved in the current offenses; however, after declining to testify against co-defendant Moss, the Petitioner stated that there was a third person involved in the crimes, implicating himself. Lead trial counsel stated that the Petitioner provided her with a name, but when her investigators attempted to track down the suspect named by the Petitioner, they could not find the individual. Lead trial counsel stated that "finally [the Petitioner] admitted there was no third person."

During co-defendant Moss's trial in November 2013, lead trial counsel testified that someone from her office attended the trial and took notes. Further, lead trial counsel testified that she recorded the trial, which her legal secretaries transcribed. She stated that she read through the transcripts from co-defendant Moss's trial and that she discussed the trial with the Petitioner, including testimony from specific witnesses such as Ms. Hill. Lead trial counsel informed the Petitioner that Ms. Hill's testimony "was going to be extremely damaging to him, even more so than [for co-defendant] Moss[]" because lead trial counsel believed that some of Ms. Hill's testimony that had been ruled inadmissible in co-defendant Moss's trial would be admissible in the Petitioner's trial. Based on the information gathered from co-defendant Moss's trial, counsel informed the Petitioner that his chances of being acquitted at trial were "not good." However, lead trial counsel testified that she reviewed the lab reports from co-defendant Moss's trial and believed that there was no DNA evidence that tied the Petitioner to the offenses, besides a fingerprint on a beer can in Mr. Crutcher's front yard.

Lead trial counsel testified that, on December 17, 2013, an investigator from her office gave the Petitioner "the indictments, the Rule 16 discovery, the witness list, and some State's motions." Lead trial counsel stated that she or another attorney discussed the discovery with the Petitioner, including information regarding cellphone towers and pinpointing the caller's location. However, she explained that "early on [the Petitioner] was not interested in seeing the discovery[,]" and it was not until co-defendant Moss's trial that the Petitioner "began discussing pleas more seriously." Lead trial counsel testified that the State provided her office with "a copy of a document out of Alabama involving a previous case that [the Petitioner] was involved in." The case involved an aggravated assault charge, and the document showed that the assault involved "an older boy who was stomped in the head by [the Petitioner]." Lead trial counsel noted that a young child had been stomped to death in the current offenses. This connection made counsel "very concerned about the death penalty. And [counsel were] very concerned about that [document] being allowed into evidence, because of a signature crime."

Lead trial counsel stated that, although it was less than thirty days until the Petitioner's trial, she believed that the trial court would have allowed the State to file a death penalty notice, but she would have asked the trial court to continue the trial. Lead trial counsel testified that she discussed with the Petitioner what death row was like and how he would not likely be able to have contact with his family on death row. Lead trial counsel testified that the Petitioner instructed her to "try and reach some sort of a plea agreement[,]" but she noted that the Petitioner did not believe that co-defendant Moss would receive six consecutive life sentences. Because the Petitioner wanted to plead guilty but was unsure of what sentence co-defendant Moss would receive, lead trial counsel offered to let the Petitioner observe co-defendant Moss's sentencing hearing. She stated that, after observing co-defendant Moss's sentencing hearing, the Petitioner wanted to enter a guilty plea on the same day. However, lead trial counsel encouraged the Petitioner to enter his plea the next day because she "did not want [the Petitioner] [to] feel[] pressured in any way, shape, or form." Lead trial counsel stated that the Petitioner did not inform her during or after the plea submission hearing that he did not want to plead guilty. She explained that, immediately after the plea submission hearing, she was not looking at the Petitioner's expression, but she heard a reaction from the audience and later learned that the Petitioner "had evidently made some gestures to the crowd."

On cross-examination, lead trial counsel stated that if she had found any reason to request a mental health evaluation for the Petitioner, even if it was only a few days before trial, she would have asked the trial court for a mental health evaluation. Lead trial counsel explained that she believed a mental health evaluation was not needed in the Petitioner's case because, after the Petitioner admitted that he had lied about a third person being involved in the offenses, "[the Petitioner] sat and told [lead trial counsel] about the murders." She explained that she did not ask any of the Petitioner's family

members about his mental health or experience in special education classes during his childhood because the Petitioner only asked her to inform his family of his trial date.

Lead trial counsel testified that she could not remember when she showed the unsigned death penalty notice to the Petitioner, but she stated that she discussed the possibility that the State could seek the death penalty with the Petitioner several times. She agreed that the Petitioner was kept in isolation during his incarceration in Tennessee before pleading guilty. Lead trial counsel stated that she asked some of the guards in the area where the Petitioner was housed about the Petitioner, but the guards had not noticed anything wrong with the Petitioner. Lead trial counsel did not make an official inquiry with the Riverbend warden or mental health unit about the Petitioner's mental health. Lead trial counsel testified that, even if she had known that the Petitioner had only completed the eighth grade, that information would not have changed her conclusion that the Petitioner did not need a mental health evaluation.

Lead trial counsel stated that she did not give the Petitioner a copy of the transcript of co-defendant Moss's trial that her office prepared; however, she discussed the transcript with the Petitioner. Lead trial counsel testified that she did not file a motion seeking to suppress the Petitioner's prior conviction that involved stomping a child because, by the time that the State informed her of that prior conviction, the Petitioner wanted to enter a guilty plea. On redirect-examination, lead trial counsel testified that she spoke with co-defendant Moss's trial counsel about the motions that co-defendant Moss filed and his trial strategy.

Co-counsel testified that he worked for the 17th Judicial District Public Defender's Office while it represented the Petitioner. He stated that he met with the Petitioner several times and that he filled out a portion of the Rule 12 report at the end of the Petitioner's guilty plea submission hearing. Co-counsel testified that the information regarding the highest school grade that the Petitioner completed came from his office's interview with the Petitioner. The report listed the Petitioner's highest grade completed as the eleventh grade. He testified that he did not know whether the Public Defender's Office discussed the issue of IQ specifically with the Petitioner, but he stated that someone from his office discussed with the Petitioner "the possible need for a mental evaluation . . . ." Co-counsel testified that he had not seen a reason to discuss the possibility of requesting a mental health evaluation for the Petitioner until "the very end, just shortly before he entered a guilty plea."

On cross-examination, co-counsel testified that to his knowledge, all of the information in the Rule 12 report was correct. Co-counsel stated that, as the Petitioner's trial approached, "[the Petitioner] wanted his trial to be put off." He testified that various members of the Public Defender's Office had discussed with the Petitioner co-defendant

Moss's trial and the fact that the State had given the Public Defender's Office an unsigned copy of a death penalty notice. When the Petitioner asked co-counsel for a mental health evaluation, co-counsel explained that the Petitioner did not have any reason for a mental health evaluation. Co-counsel testified that he advised the Petitioner that a mental health evaluation may not be in the Petitioner's best interest because continuing the trial to perform a mental health evaluation would give the State more time to consider filing a death penalty notice. He stated that the Petitioner "seemed to agree" with his advice against requesting a mental health evaluation and that the Petitioner wanted co-counsel to continue settlement discussions with the State.

On redirect-examination, co-counsel testified that the Petitioner never informed him that the Petitioner was in special education classes while in school or that the highest education level that the Petitioner had completed was eighth grade. Co-counsel testified that he was present during the Petitioner's guilty plea submission hearing but that he did not see the Petitioner wink or stick his tongue out; however, he "heard the reaction from the crowd."

The Petitioner was recalled and testified that he never received a copy of the transcript of Ms. Hill's testimony and that neither lead trial counsel nor co-counsel discussed Ms. Hill's testimony with him. The Petitioner also stated that he did not inform lead trial counsel that he had completed the eleventh grade. On cross-examination, the Petitioner stated that he did not ask counsel about Ms. Hill's testimony and instead asked for a copy of the discovery in his case.

The post-conviction court found that the Petitioner could read, write, and "talk articulately." The post-conviction court noted that, during the plea submission hearing, the Petitioner answered all of the trial court's questions "clearly, concisely and directly." The post-conviction court found that the Petitioner was "no stranger to the criminal justice system[]" and noted that none of the Petitioner's guilty pleas entered in Alabama had been set aside "for any mental health issues or competency standards." The post-conviction court found that the Petitioner was aware of the evidence that would have been presented against him had he proceeded to trial because an employee of the Public Defender's Office observed co-defendant Moss's trial every day. The post-conviction court noted that the Petitioner could have avoided a greater penalty by pleading guilty than what he would have received after a jury trial because the State considered filing a death penalty notice. The post-conviction court found that the Petitioner did not indicate to the trial court during the plea submission hearing that he did not understand what was happening and that he "answered all the questions of the [trial] court clearly and indicated his understanding of the proceedings." The post-conviction court noted that, "after his plea and upon exiting the courtroom[, the Petitioner] turned his back and then very smugly smiled and winked at the gallery which included families of those slain." The

post-conviction court found that the fact that lead trial counsel and co-counsel showed the Petitioner the unsigned death penalty notice from the State before the Petitioner entered his guilty plea was not coercive.

The post-conviction court credited the testimony of lead trial counsel and co-counsel and found that lead trial counsel and co-counsel did not threaten or coerce the Petitioner to plead guilty. The post-conviction court found that the Petitioner did not present any credible evidence that a mental health evaluation was needed other than the Petitioner's own testimony and that he "produced little to no credible evidence that, but for any of his alleged deficiencies of counsel, he would have possibly risked his life and gone to trial." The post-conviction court concluded that the Petitioner had failed to prove by clear and convincing evidence that his plea was coerced or involuntary and denied his petition for post-conviction relief. The post-conviction court also denied the Petitioner's request for a mental evaluation at the post-conviction stage under Tennessee Supreme Court Rule 13 and found that this issue had no merit. The Petitioner's timely appeal followed.

## II. Analysis

### Standard of Review

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. Kendrick v. State, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. Id.; Fields, 40 S.W.3d at 456 (citing Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." Fields, 40 S.W.3d at 456 (citing Henley, 960 S.W.2d at 579; see also Kendrick, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. Kendrick, 454 S.W.3d at 457.

### Expert testimony at post-conviction hearing

The Petitioner argues that the post-conviction court erred by denying his request for a mental health evaluation at the post-conviction stage. The State contends that the

post-conviction court properly denied the Petitioner's request for a mental health expert's evaluation and testimony.

In Owens v. State, our supreme court held that Tennessee Code Annotated section 40-14-207(b) applies to post-conviction capital cases. 908 S.W.2d 923, 927-28 (Tenn. 1995). In Davis v. State, our supreme court noted that "[i]n Tennessee there is no rule or statute that entitles a non-capital post-conviction petitioner to state funded expert assistance." 912 S.W.2d 689, 695 (Tenn. 1995) (citing Tenn. Code Ann. § 40-14-207(b)). After examining applicable cases decided by the Supreme Court of the United States, as well as the Tennessee Constitution, our supreme court held that "the state is not required to provide expert assistance to indigent non-capital post-conviction petitioners." Id. at 696-97; see also Roy Earl Collins v. State, No. 03C01-9709-CR-00389, 1998 WL 619216, at *3 (Tenn. Crim. App. Sept. 16, 1998), perm. app. denied (Tenn. Mar. 8, 1999).

In Roy Earl Collins, the petitioner pled guilty to first degree murder and received a life sentence. Id. at *1. On appeal from the denial of post-conviction relief, this court determined that, at the post-conviction stage, the case no longer qualified as a capital case. Id. at 4. This court noted that, in Beeler v. State, "our supreme court adopted a definition of a capital case from Black's Law Dictionary, 3d ed., as follows: A capital case or offense is one in or for which the death penalty may, but need not necessarily be inflicted." Id. at 4 (citing Beeler, 332 S.W.2d 203, 207 (Tenn. 1959); Black's Law Dictionary, 3d ed.). The court determined that "[b]ecause the defendant was no longer at risk at the time he filed his post-conviction claim, his petition c[ould not] be classified as a capital case." Id.; see also John Paul Seals v. State, No. E2001-01756-CCA-R3-PC, 2002 WL 1482772, at *1, 3 (Tenn. Crim. App. Jul. 11, 2002), perm. app. denied (Tenn. Nov. 4, 2002) (concluding that the petitioner's case was not a capital case because he pled guilty to first degree murder and received a life sentence).

Similarly, when the Petitioner filed his petition for post-conviction relief, he had pled guilty, received four concurrent and two consecutive life sentences, and was no longer at risk of receiving the death penalty. The Petitioner has not presented any reason for this court to reverse prior precedent and establish a new rule of law allowing a petitioner in a non-capital case to receive state funding for an expert at the post-conviction stage. Therefore, the post-conviction court properly denied the Petitioner's request for funding for an expert witness at the post-conviction stage. See Wesley Jones v. State, No. W2015-01481-CCA-R3-PC, 2016 WL 4357422, at *22 (Tenn. Crim. App. Aug. 11, 2016), perm. app. denied (Tenn. Oct. 21, 2016) (the post-conviction court did not err in determining that the petitioner, who was convicted of first degree murder and received a life sentence, was not entitled to assistance from a DNA expert at the post-conviction hearing); Klein Adlei Rawlins v. State, No. M2010-02105-CCA-R3-PC, 2012

WL 4470650, at *14 (Tenn. Crim. App. Sept. 27, 2012), perm. app. denied (Tenn. Feb. 25, 2013) (the post-conviction court did not err in determining that the petitioner, who was convicted of first degree felony murder and aggravated child abuse and received a life sentence plus twenty years, was not entitled to assistance from an expert at the post-conviction hearing); Sammie Lee Taylor v. State, No. W1999-00977-CCA-R3-PC, 2000 WL 714387, at *5-6 (Tenn. Crim. App. May 26, 2000), perm. app. denied (Tenn. Dec. 4, 2000) (the post-conviction court did not err in determining that the petitioner, who was convicted of felony murder, especially aggravated kidnapping, especially aggravated robbery, and aggravated sexual battery and received a sentence of life without parole plus sixty-two years, was not entitled to assistance from an expert at the post-conviction hearing). The Petitioner is not entitled to relief on this ground.

*Unknowing and Involuntary Guilty Plea*

The Petitioner also argues that his guilty plea was coerced and involuntary based on the circumstances surrounding his plea. The Petitioner argues that his guilty plea was involuntary because he did not receive a mental health examination, he was in isolation while incarcerated, he observed co-defendant Moss receive six consecutive life sentences prior to his plea, and he only completed the eighth grade. The Petitioner also asserts that the trial court erred by failing to explore the Petitioner's responses during the plea colloquy to ensure that the Petitioner's guilty plea was knowing and voluntary. The State responds that the Petitioner's guilty plea was knowing and voluntary.

Whether a guilty plea is intelligent and voluntary is a mixed question of law and fact. Jaco, 120 S.W.3d at 830-31. Therefore, in such cases we review the post-conviction court's findings of fact de novo with a presumption of correctness. Id. The post-conviction court's findings of law are reviewed purely de novo. Id.

When reviewing a guilty plea, this court looks to both the federal standard as announced in the landmark case Boykin v. Alabama, 395 U.S. 238 (1969), and the state standard as announced in State v. Mackey, 553 S.W.2d 337 (Tenn. 1977), superseded on other grounds by Tenn. R. Crim. P. 37(b) and Tenn. R. App. P. 3(b). Don Allen Rodgers v. State, No. W2011-00632-CCA-R3-PC, 2012 WL 1478764, at *5 (Tenn. Ct. Crim. App. Apr. 26, 2012). Under the federal standard, there must be an affirmative showing that the plea was "intelligent and voluntary." Boykin, 395 U.S. at 242. Likewise, the Tennessee Supreme Court has held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, *i.e.*, that he has been made aware of the significant consequences of such a plea . . . ." Mackey, 553 S.W.2d at 340. "[A] plea is not 'voluntary' if it is the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Boykin,

395 U.S. at 242-43). A reviewing court must examine the totality of the circumstances to determine if a guilty plea was knowing and voluntary. State v. Turner, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995).

In order to determine whether a plea is intelligent and voluntary, the trial court must "canvass[] the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." Boykin, 395 U.S. at 244. The trial court looks to several factors before accepting a plea, including:

> [T]he relative intelligence of the defendant; degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship, 858 S.W.2d at 904; Howell v. State, 185 S.W.3d 319, 330-31 (Tenn. 2006). Once the trial court has conducted a proper plea colloquy, it discharges its duty to assess the voluntary and intelligent nature of the plea and creates an adequate record for any subsequent review. Boykin, 395 U.S. at 244.

Statements made by a petitioner, his attorney, and the prosecutor during the plea colloquy, as well as any findings made by the trial court in accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings." Blackledge v. Allison, 431 U.S. 63, 73-74 (1977). Statements made in open court carry a strong presumption of truth, and to overcome such presumption, a petitioner must present more than "conclusory allegations unsupported by specifics." Id. at 74.

In Gary Randall Yarnell v. State, this court addressed the issue of an involuntary or unknowing guilty plea in factual circumstances similar to that of the Petitioner. No. E2004-01762-CCA-R3-PC, 2005 WL 1981471, at *1 (Tenn. Crim. App. Aug. 15, 2005), perm. app. denied (Tenn. Feb. 6, 2006). In that case, the petitioner pled guilty to first degree murder, especially aggravated robbery, and especially aggravated burglary, for which he respectively received concurrent sentences of life, fifteen years, and twelve years. Id. During post-conviction proceedings, the petitioner testified that he was confined for two years prior to pleading guilty, was depressed, and requested a mental health evaluation, but trial counsel maintained that the petitioner was competent to stand trial. Id. at *4. On appeal from the denial of his petition for post-conviction relief, the petitioner argued, in part, that his guilty plea was involuntary and unknowing because he was depressed when he pled guilty. Id. at *8. This court determined that the post-

- 17 -

conviction court correctly held that the petitioner's guilty plea was voluntarily and knowingly entered because "[n]othing in the transcript of the petitioner's plea submissions suggests that he was incapable of rationally weighing the advantages of pleading guilty versus proceeding to trial." Id. This court also noted that "other than the petitioner's self-serving testimony regarding his depression, he offered no independent corroboration that he was incapable of making a rational decision." Id.

Similarly, the Petitioner offers no support for his contention that his mental health caused his guilty plea to be unknowing and involuntary besides his own testimony. Lead trial counsel, whose testimony the post-conviction court credited, testified that she looked for grounds to request a mental health evaluation during her initial meeting with the Petitioner, but she could not find a ground to request a mental health evaluation. Additionally, lead trial counsel stated that the Petitioner seemed "at home with his situation" at Riverbend and noted that the Petitioner "was always smiling[,]" which was unusual for "someone who was facing such serious charges." She also stated that the Petitioner "didn't show the level of stress and anxiety that [she had] seen in many of [her] clients before." The Petitioner asserted at the post-conviction hearing that he was not in his "right state of mind" when he pled guilty, but the post-conviction court did not credit the Petitioner's testimony. The Petitioner testified that he had previously received treatment in school and while incarcerated for mental health issues, but he did not introduce any evidence into the record of this treatment. When the Petitioner asked co-counsel about requesting a mental health evaluation approximately one month before trial, co-counsel, whose testimony the post-conviction court credited, advised against requesting a mental health examination because it would have given the State more time to file a death penalty notice. Co-counsel testified that the Petitioner seemed to agree with co-counsel's advice and authorized co-counsel to continue settlement discussions with the State.

The totality of the circumstances establishes that the Petitioner made an intelligent, rational, and voluntary decision to plead guilty. Lead trial counsel stated that she suggested that the Petitioner observe co-defendant Moss's sentencing hearing so that the Petitioner would have a better idea of the sentence he might receive if he proceeded to trial or entered an open guilty plea. She also testified that she asked the Petitioner to wait until the next day to enter his guilty plea to ensure that his plea was voluntary and not coerced. The Petitioner conceded that none of his eleven prior guilty pleas in Alabama were overturned on the grounds that the Petitioner's guilty plea was unknowing or involuntary. The Petitioner avoided receiving a penalty greater than two consecutive life sentences at trial by pleading guilty; if the Petitioner had proceeded to trial, the State may have filed a death penalty notice, or the Petitioner may have received six consecutive life sentences like co-defendant Moss.

The plea submission hearing transcript shows that the trial court conducted a thorough Tennessee Rule of Criminal Procedure 11(b) colloquy with the Petitioner and accepted the Petitioner's plea as knowingly and voluntarily entered; the trial court asked the Petitioner whether his guilty plea was freely and voluntarily entered three times. Additionally, the trial court asked the Petitioner why he was pleading guilty after filing a speedy trial motion and explored the Petitioner's answers when the Petitioner seemed confused about the question. The Petitioner's action of winking at the visitor's gallery after his plea submission hearing contradicts his claim that he was not in his "right state of mind" during his plea, as does his letter to lead trial counsel thanking her for her representation; both of these actions lead to an inference that the Petitioner was pleased with the results of his guilty plea. We hold that, based on the totality of the circumstances, the post-conviction court properly concluded that the Petitioner's guilty plea was knowing and voluntary. The Petitioner is not entitled to relief on this ground.

*Ineffective Assistance of Counsel*

The Petitioner also asserts that "competent defense counsel" would have requested a mental health evaluation for the Petitioner.[3] The State responds that the Petitioner has "failed to prove his factual allegations by clear and convincing evidence and failed to meet his burden of demonstrating deficient performance and prejudice[.]"

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. Strickland, 466 U.S. at 687; Henley, 960 S.W.2d at 580; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. Finch v. State, 226 S.W.3d 307, 316 (Tenn. 2007) (citing Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial

---

[3] We note that the Petitioner failed to include any case law relating to ineffective assistance of counsel in his brief and only included two factual sentences addressing this issue. See Tenn. Ct. Crim. App. 10(b). However, we will address this issue out of an abundance of caution.

strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

A substantially similar two-prong standard applies when the petitioner challenges counsel's performance in the context of a guilty plea. Hill v. Lockhart, 474 U.S. 52, 58 (1985); Don Allen Rodgers, 2012 WL 1478764, at *4. First, the petitioner must show that his counsel's performance fell below the objective standards of reasonableness and professional norms. See Hill, 474 U.S. at 58. Second, "in order to satisfy the 'prejudice' requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would have not have pled guilty and would have insisted on going to trial." Id. at 59.

The post-conviction court found that the Petitioner did not present any credible evidence that a mental health evaluation was needed besides the Petitioner's own testimony and that he "produced little to no credible evidence that, but for any of his alleged deficiencies of counsel, he would have possibly risked his life and gone to trial." The evidence does not preponderate against the post-conviction court's findings. As noted above, lead trial counsel testified that she and co-counsel looked for grounds to request a mental health evaluation for the Petitioner but could not find any. Even when the Petitioner asked co-counsel about a mental health evaluation one month before trial, the Petitioner could not give co-counsel a reason to request the evaluation. Moreover, the Petitioner failed to produce any evidence at the post-conviction hearing regarding his past or current mental health treatment. He is not entitled to relief on this ground.

- 20 -

## III. Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE